UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| DARRE GARDNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case number 4:13cv0230 AGF |
| | ) | TCM |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is a 42 U.S.C. § 405(g) action for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the applications of Darre Gardner for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b. Mr. Gardner (Plaintiff) has filed an opening brief and reply brief in support of his complaint; the Commissioner has filed a brief in support of her answer. The case was referred the undersigned United States Magistrate Judge for a review and recommended disposition pursuant to 28 U.S.C. § 636(b).

### Procedural History

Plaintiff applied for DIB and SSI in October 2011, alleging he had become disabled on December 17, 2010, by a mental condition and an irregular heart beat. (R.[1] at 116-29, 192.)

---

[1]References to "R." are to the administrative record filed by the Commissioner with her answer.

His applications were denied initially and following a hearing held in April 2012 before Administrative Law Judge (ALJ) Jhane Pappenfus. (Id. at 13-25, 30-54, 57-61.) The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-5.)

### Testimony Before the ALJ

Plaintiff, represented by counsel, and Tracy H. Young, M.A., testified at the administrative hearing.

Plaintiff testified he lives in an apartment with "the last friend I have left." (Id. at 32.) He is trying to get a General Equivalency Degree (GED); GED classes start the next week. (Id. at 33, 34.) He has had vocational training as a driver and forklift operator. (Id. at 33.) He is receiving unemployment benefits, and has been looking for housekeeping jobs or warehouse work where he can work alone and without any supervision. (Id.)

He has been in jail four or five times, but not in prison. (Id. at 34-35.) He has been hospitalized for a suicide attempt. (Id. at 35.) He is not now on any medication. (Id. at 36.)

Plaintiff testified that his last job ended because he was acting based on what voices were telling him to do. (Id. at 36.) He then ended up in the hospital for approximately five days. (Id. at 37.) The hospital referred him to a doctor, but he could not afford to keep paying him. (Id.)

Plaintiff has been hearing voices since he was six years old. (Id. at 38.) He hears them every day; they are getting "[s]tronger and stronger." (Id. at 39.) He can sometimes ignore them. (Id.) The voices sometimes tell him to do the opposite of what he should be doing. (Id.

at 40.)  Sometimes, the voices keep him awake.  (Id.)  For instance, he has not slept for two days.  (Id.)  The voices tell him to hurt himself or other people.  (Id.)  He has hit his mother in the head with a bat.  (Id.)

On an average day, Plaintiff goes to the career center and works on the computer with a friend.  (Id. at 42.)  He goes for a short walk.  (Id.)  He tries to read and do some class work for his GED.  (Id.)  He also testified that he does not go out often because he is paranoid.  (Id. at 43.)  Homeland Security has recommended he stay to himself after he sent a threatening letter.  (Id.)

Plaintiff last smoked marijuana at New Year's.  (Id. at 40.)

Ms. Young testified as a vocational expert (VE).  (Id. at 46.)  Asked to classify Plaintiff's past job as a warehouse worker, she replied that it is a medium, unskilled job with a specific vocational preparation (SVP) level of 2[2] and a *Dictionary of Occupational Titles* (DOT) number of 211.677-018.  (Id. at 47.)  Asked to assume that Plaintiff has no physical impairments but has mental impairments limiting him to unskilled work that does not include constant, regular contact with the general public and more than infrequent handling of customer complaints, Ms. Young responded that the only past job that Plaintiff can perform is that of a warehouse worker.  (Id. at 48.)  He can, however, also work as a kitchen helper, or dishwasher, DOT 318.687-010, which is medium, unskilled; as a commercial cleaner, DOT

---

[2]"The SVP level listed for each occupation in the *Dictionary of Occupational Titles* (DOT) connotes the time needed to learn the techniques, acquire the information, and develop the facility needed for average work performance.  At SVP level one, an occupation requires only a short demonstration, while level two covers occupations that require more than a short demonstration but not more than one month of vocational preparation.  2 *Dictionary of Occupational Titles* app. C at 1009 (4th ed. 1991)."  **Hulsey v. Astrue**, 622 F.3d 917, 923 (8th Cir. 2010).

381.687-014, heavy, unskilled; or as a hand packager, DOT 920.587-018., medium, unskilled. (Id. at 48-49.) Each of these three jobs has an SVP of two and exists in significant numbers in the national and state economies. (Id.)

Ms. Young further testified there is no conflict between her vocational testimony and the information in the DOT. (Id. at 49.)

If the claimant can have no contact with the general public, supervisors, or co-workers, there are no jobs he can perform. (Id.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ includes forms completed as part of the application process, documents generated pursuant to Plaintiff's applications, records from health care providers, and various assessments of his mental capabilities.

When applying for DIB and SSI,[3] Plaintiff completed a Disability Report. (Id. at 191-98.) He stopped working because of his impairments, see page one, supra, on December 17, 2010. (Id. at 192.) The highest grade he completed is the tenth grade. (Id. at 193.) He had completed special training in 2003 as a forklift operator and in 2002 as a commercial driver. (Id.)

On a Function Report, Plaintiff described his daily activities as searching for a job. (Id. at 172.) He is depressed most of the day. (Id.) He frequently day-dreams. (Id.) Before his impairments, he was able to work, handle pressure, and have friends. (Id. at 173.) His impairments interfere with his sleep. (Id.) He needs reminders to help him take care of his

---

[3]These are Plaintiff's second DIB and SSI applications.

personal needs.  (<u>Id.</u> at 174.)  He responded that he does not prepare his own meals because his mother does not trust him around sharp objects.  (<u>Id.</u>)  He also responded that he prepares his own meals once a day.  (<u>Id.</u>)  He does not do any household chores because he cannot concentrate.  (<u>Id.</u> at 174-75.)  He does not go outside because his paranoia makes him think people are watching him and will hurt him.  (<u>Id.</u> at 175.)  He does not drive because traffic and other drivers get on his nerves.  (<u>Id.</u>)  He does not have any hobbies or interests.  (<u>Id.</u> at 176.)  He does not spend time with other people because it is difficult for him to engage in conversation.  (<u>Id.</u>)  His impairments adversely affect his abilities to squat, bend, stand, sit, kneel, talk, hear, complete tasks, concentrate, understand, follow instructions, and get along with others.  (<u>Id.</u> at 177.)  They do not affect his abilities to lift, reach, walk, or use his hands.  (<u>Id.</u>)  He can walk for two and one-half miles before having to stop and rest for ten minutes.  (<u>Id.</u>)  He does not get along well with authority figures.  (<u>Id.</u> at 178.)  He does not handle stress or changes in routine well.  (<u>Id.</u>)  On a separate report, Plaintiff disclosed that he was currently living with his mother and the arrangement was not good for him.  (<u>Id.</u> at 182.)

Plaintiff's mother completed a Function Report on his behalf.  (<u>Id.</u> at 183-90.)  She reported that he was up all night crying.  (<u>Id.</u> at 184.)  He does not bathe and wears the same clothes three times a week.  (<u>Id.</u>)  She writes him letters informing him she can smell him.  (<u>Id.</u> at 185.)  She does not trust him around sharp objects because he is suicidal.  (<u>Id.</u>)  The only household chore he performs is taking out the trash.  (<u>Id.</u>)  He does not like to be outside.  (<u>Id.</u>)  If he goes out alone, he knocks over trash cans and throws rocks at people's cars.  (<u>Id.</u> at 186.)  He has been the way he is for twenty years.  (<u>Id.</u> at 187.)  Once a month, they both go to the

career center to check on job openings. (Id.) His impairments adversely affect his abilities to sit, understand, talk, hear, use his hands, follow instructions, complete tasks, get along with others, remember, and concentrate. (Id. at 188.) He cannot walk to the bathroom without sweating. (Id.) He has told people he wants to kill the landlord and her. (Id.) He was fired from one job at a nursing home after he insulted his boss. (Id. at 189.)

In a Work History Report, Plaintiff listed nine jobs, including two jobs working in a warehouse. (Id. at 160-71.) In one, he walked for three hours a day, stood for three, and sat for one-half. (Id. at 166.) He handled, grabbed, or grasped big objects for seven hours, and reached for seven hours. (Id.) The heaviest weight he lifted was fifty pounds. (Id.) He lifted this amount frequently. (Id.) In the other job, he walked for six hours a day, stood for six hours a day, and sat for one-half hour. (Id. at 167.) He handled, grabbed, or grasped big objects for six hours. (Id.) The heaviest weight he lifted was less than ten pounds. (Id.) He had worked at a nursing home from March 2008 to December 17, 2010. (Id. at 160.)

An earnings report lists annual earnings for Plaintiff in the years from 1988 to 2010, inclusive. (Id. at 141.) In the most recent fifteen years, he earned more than $10,000 annually in three years: 2000, 2009, and 2010. (Id.) His highest earnings, $16,287.97, were in 2010. (Id.) His next highest, $12,138.60, were in 2009. (Id.) In those fifteen years, Plaintiff worked for twenty-four employers. (Id. at 146-51.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of his applications. (Id. at 210-14.) There had been no change, for the better or the worse, in his

impairments since he filed the original report, nor did he have any new limitations, symptoms, or impairments.  (Id. at 210.)

The few medical records are summarized below in chronological order and begin with those of Plaintiff's September 2010 visit to the emergency room at Christian Hospital Northeast/Northwest (Christian Hospital) for complaints of multiple, frequent boils.  (Id. at 233-49.)  His current boil was on his left lower extremity.  Plaintiff was diagnosed with cellulitis, discharged with a prescription for Bactrim (an antibiotic), to be taken twice a day until finished, and instructed to follow up with Helal Ekramuddin, M.D., if his condition did not improve.  (Id. at 241, 244.).

Plaintiff returned to the Christian Hospital emergency room in July 2011 for treatment of a urinary problem.  (Id. at 250-73.)  He was diagnosed with urethritis caused by a sexually transmitted disease, treated with Rocephin and Zithromax (both antibiotics), and discharged home in stable condition.  (Id. at 252, 255, 258, 260, 263.)

For two days in November 2011, Plaintiff was treated at the psychiatric unit at DePaul Health Center.  (Id. at 278-94.)  Three weeks earlier, he had been angry when at the Social Security Department and had made threats to the Child Support Division.[4]  (Id. at 280.)  On the day of his admission, the police had gone to his house and taken him to the hospital.  (Id.)  He reported that he did not feel suicidal or homicidal and was not psychotic.  (Id.)  He was in a "pretty good mood."  (Id.)  He did not feel hopeless, helpless, worthless, or useless.  (Id.)  He

---

[4]Another notation in the medical records refers to the threats being made the same day he was taken to the hospital.  (Id. at 282.)

understood that he needed help, but denied that he needed to be hospitalized.  (Id.)  He smoked cigarettes and marijuana.  (Id.)  He was of average intelligence.  (Id.)  He was divorced, had five children, lived with his mother, and collected unemployment.  (Id.)  He had previously taken medication, but had not done so for the past five years.  (Id. at 282.)  He stated the medication had helped, but not with his job situation.  (Id.)  He suffered from insomnia.  (Id.)  His social history included use of marijuana.  (Id. at 283.)  Cannabinoids were detected in his urine; other drugs were not.  (Id. at 293.)  Plaintiff was treated with individual, group, and milieu psychotherapy and medication.  (Id. at 276.)  On examination at discharge, he was alert and oriented to time, place, and person; was fairly pleasant and cooperative; and was not in acute distress.  (Id. at 280.)  His mood was good; his affect was intense and reactive.  (Id. at 281.)  His thought process was linear and goal-oriented; his thought content lacked delusions. (Id.)  His insight and judgment were fair; his cognition was clear.  (Id. at 278.)  He denied having auditory and visual hallucinations and suicidal or homicidal ideations.  (Id.)  His heart had a normal rate, regular rhythm, and normal heart sounds.  (Id. at 284.)  The attending physician, Vadim Baram, M.D., recommended he take trazodone[5] at bedtime and Celexa[6] daily.  (Id.)  Plaintiff's discharge diagnosis was mood disorder, not otherwise specified; his Global Assessment of Functioning (GAF) was 55.[7]  (Id. at 278.)  His condition on discharge

_____

[5]Trazodone is prescribed for the treatment of major depressive disorder.  Trazodone, http://www.drugs.com/trazodone.html (last visited Jan. 27, 2014).

[6]Celexa (citalopram) is used in the treatment of depression.  Celexa, http://www.drugs.com/celexa.html (last visited Jan. 24, 2014).

[7]"According to the *Diagnostic and Statistical Manual of Mental Disorders* (4th Ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's

was fair.  (Id. at 279.)  He was to follow up within one week.  (Id.)  His prognosis was "questionable" as it depended on community support, medications management, and psychotherapy.  (Id.)  Information about community resources was provided to Plaintiff.  (Id.)

Also before the ALJ were assessments by examining and nonexamining consultants of Plaintiff's mental abilities and limitations.

Pursuant to his former applications, see note three, supra, Plaintiff underwent a psychological evaluation in August 2009 by Dianna Moses-Nunley, Ph.D., a licensed psychologist.  (Id. at 222-28.)  Dr. Moses-Nunley had reviewed July 2008 records from a emergency room admission for suicidal ideation.  (Id. at 222.)  Plaintiff was then employed doing housekeeping work for a nursing home[8] for the past five months.  (Id.)  He had taken a bus to the appointment.  (Id.)  Plaintiff reported that his primary problem was hearing voices. (Id.)  This had begun in 1992 after his cousin died.  (Id.)  Currently, he heard five voices.  (Id.) The main voice told him to hurt himself or others and to do such antisocial acts as stealing and cursing people.  (Id.)  It was more and more difficult to ignore this voice.  (Id.)  Another voice predicted what was going to happen, and was right.  (Id.)  Taking medication or listening to music over headphones had not helped.  (Id.)  Also since 1992, Plaintiff had been depressed.

---

overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).  A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted).

[8]The name of the home is the same as the one identified by his mother as the place he had fired from for insulting his boss.

(<u>Id.</u> at 223.)  He had a sad and hopeless mood, lacked interest or took no pleasure in things, had low energy, could not concentrate, and had poor self-esteem.  (<u>Id.</u>)  He had lost weight because he had no appetite.  (<u>Id.</u>)  He had tried to commit suicide three times in June 2008.  (<u>Id.</u>)  He would not try again because he did not want to be hospitalized.  (<u>Id.</u>)  Since that summer, his depression had increased and his ability to ignore the voices had decreased.  (<u>Id.</u>)

Plaintiff reported he had dropped out of school in the tenth grade because of fighting and disciplinary problems.  (<u>Id.</u>)  He had tried taking the GED test and the military entrance exam, but was prevented from timely finishing either due to the voices in his head.  (<u>Id.</u>)  He had lost four to five jobs over the past five years because  he would act on the voices' violent commands in response to co-workers saying offensive things to him.  (<u>Id.</u>)  He had previously abused alcohol, but had stopped drinking in 2007.  (<u>Id.</u>)  He had had "multiple arrests for drunk and disorderly conduct" and one arrest for possession of an illegal substance, but he had never been incarcerated.  (<u>Id.</u>)

On examination, Plaintiff was dressed casually and appropriately.  (<u>Id.</u>)  His grooming was fair.  (<u>Id.</u>)  He was calm and polite.  (<u>Id.</u>)  His speech was spontaneous and "mostly coherent, relevant, and logical."  (<u>Id.</u>)  There was one exception – when he talked about something irrelevant a voice was telling him.  (<u>Id.</u>)  He was cooperative, but "evasive about the extent of his current suicidal ideation and likelihood of following through."  (<u>Id.</u>)  "He was also evasive about having actually carried out thoughts of harming others."  (<u>Id.</u>)  He was "fairly talkative," and did not go off on tangents.  (<u>Id.</u>)  "He described his current mood as good, but stated he [was] typically nervous, angry and irritable."  (<u>Id.</u>)  He had a neutral affect.  (<u>Id.</u>)  He

reported having visual hallucinations of fog in his friends' home or flying shapes in his room at night. (Id.) He was oriented in all spheres. (Id. at 224.) Remote memory was adequate, but his knowledge of current events was poor. (Id.) He could not recall any of the four past presidents. (Id.) He could not recall any of six numbers presented, "claiming he had gotten distracted." (Id.) His insight and judgment appeared to be fair. (Id.) His abstract reasoning skills were poor. (Id.)

Plaintiff further reported he lived with a female friend, but stayed locked in his room because he felt like hurting her. (Id.) He read a lot and was trying to write a book. (Id.) Because of difficulties concentrating, it took him two hours to write a sentence. (Id.) To prevent himself from engaging in antisocial behavior, he avoided going out. (Id.) He could take care of his personal needs, although he often went for long periods without bathing or grooming because he was tired, forgetful, or overslept. (Id.) A friend had been reminding him for the past two months when to take care of his grooming. (Id.) Plaintiff reported he had poor concentration and pace; his persistence was good if he was engaged in antisocial activities. (Id.)

Dr. Moses-Nunley diagnosed Plaintiff with schizoaffective disorder, depressive type, and rated his GAF as 41.[9] (Id. at 224-25.) His prognosis was guarded. (Id. at 225.) "While the hallucinations and depression that [he] reports are likely to respond to treatment, he will probably continue to manifest some evidence of his disorder for the foreseeable future. It is

_____

[9]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

unlikely that he will be able to function socially and occupationally at a level similar to his peers for the next twelve months." (Id.) She opined that Plaintiff was a danger to himself and others based on his history of acting on the voices' commands. (Id.) "He [was] likely to have difficulty interacting with others in a work setting and is subject to react to minor offenses with violence." (Id.) His ability to remember and carry out instructions or to self-monitor his work was impaired by his hallucinations and his difficulties concentrating. (Id.) His judgment "appear[ed] unreliable at best and very poor at worst." (Id.) He could not manage his own funds. (Id.)

Dr. Moses-Nunley also completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) for Plaintiff after evaluating him. (Id. at 226-28.) In the category of understanding, remembering, and carrying out instructions, Plaintiff had a marked limitation in three of the five listed abilities. (Id. at 226.) He had a moderate limitation in one ability, i.e., remembering short, simple instructions, and no limitation in one ability, i.e., carrying out short, simple instructions. (Id.) This was based on his report of having difficulty remembering instructions and being distracted by internal voices. (Id.) In the category of responding appropriately to supervisors, co-workers, and work pressure, Plaintiff had a marked limitation in three of the five listed abilities and a moderate limitation in two: (i) interacting appropriately with supervisors and (ii) responding appropriately to changes in a routine work setting. (Id. at 227.) The limitations in this category were also attributable to his internal voices. (Id.)

In December 2011, pursuant to his current applications, Plaintiff underwent another psychological evaluation. (<u>Id.</u> at 297-301.) This evaluation was by Lloyd Irwin Moore, Ph.D. Dr. Moore described Plaintiff as being "initially quite defensive and quite hostile. He became much more cooperative during the course of the intervention. His hostility is related both to his mental illness as well as personality disorder . . . ." (<u>Id.</u> at 297.) Also because of his mental illness, Plaintiff did not drive. (<u>Id.</u>) Plaintiff reported he left his job of two years at a nursing home because he was having hallucinations of constantly seeing ghosts. (<u>Id.</u> at 298.) He had had other jobs, but could not recall the type. (<u>Id.</u>) He had tried to get a GED, but had not been successful. (<u>Id.</u>) He stayed at home – he lived with his mother – because he got into trouble if he went out. (<u>Id.</u>) He had been incarcerated in the county jail for threats and fighting, but had never been in state prison. (<u>Id.</u>) He reported that the psychiatrist at DePaul had recommended he not work because of his explosive behavior. (<u>Id.</u>) He further reported that his sleep was poor with medication. (<u>Id.</u> at 299.) Without medication, he stayed up for days and then crashed. (<u>Id.</u>) On a scale from one to ten, with ten "being the most dysthymic one can report," his mood was an eight or nine. (<u>Id.</u>) He had suicidal ideation with no current intent and had homicidal ideation. (<u>Id.</u>) He has had mental health problems since he was six years old. (<u>Id.</u>) He shot a man five times in the back for beating his mother. (<u>Id.</u>) He first saw a mental health professional when he was seven or eight years old. (<u>Id.</u>) As an adult, he has had three admissions to psychiatric facilities, "primarily for some mania and mostly depression." (<u>Id.</u>) On examination, his affect was flat; his mood was "extremely depressed"; his speech was normal in rate and volume; his motor activity was calm, although he was

hypervigilant; his "thought processes indicated some delusional thinking." (Id.) He reported radical mood swings. (Id.) He was oriented to person, place, and time, but appeared to be "quite stressed." (Id.) He did not accurately copy a diagram, wrote his signature when asked to write a sentence, stated he could not concentrate to count backwards from twenty to one, and knew who were the current and past presidents. (Id. at 299-300.) His proverb interpretation was very poor. (Id. at 300.) His judgment and psychological insight were fair. (Id.) Dr. Moore described Plaintiff as having poor impulse control, getting angry quite easily and not dealing with his anger very well. (Id.) Plaintiff was "quite angry" he was living with his mother. (Id.) His diagnosis was bipolar I disorder, severe with psychosis, and personality disorder, not otherwise specified with antisocial traits. (Id.) Plaintiff's current GAF was 50. (Id. at 301.) He had marked impairments in his activities of daily living, in social functioning, and in concentration, persistence, and pace. (Id.)

In December 2011, a Psychiatric Review Technique form was completed for Plaintiff by a non-examining consultant, Kyle DeVore, Ph.D. (Id. at 302-13.) Plaintiff was described as having an affective disorder, i.e., a mood disorder, not otherwise specified, and a personality disorder not otherwise specified with antisocial traits. (Id. at 302, 305, 307.) These disorders resulted in Plaintiff having mild restrictions in his activities of daily living, moderate difficulties in social functioning, and mild difficulties in maintaining concentration, persistence, or pace. (Id. at 310.) He had not had any repeated episodes of decompensation

of extended duration. (Id.) Dr. DeVore declined to give the December 2011 evaluation report[10] any weight, finding it unsupported by the record. (Id. at 312.)

On a Mental Residual Functional Capacity Assessment, Dr. DeVore assessed Plaintiff as not being significantly limited in two of the three abilities in the area of understanding and memory and moderately limited in his ability to understand and remember detailed instructions. (Id. at 314.) In the area of sustained concentration and persistence, Plaintiff was moderately limited in one of the eight listed abilities, i.e., his ability to carry out detailed instructions, and not limited in the remaining seven. (Id. at 314-15.) In the area of social interaction, Plaintiff was moderately limited in three of five abilities: the ability to (1) interact appropriately with the general public; (2) accept instructions and respond appropriately to criticism from supervisors; and (3) get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (Id. at 315.) Plaintiff was not significantly limited in any of the four abilities listed for the area of adaptation. (Id.)

## The ALJ's Decision

The ALJ first determined Plaintiff met the insured status requirements of the Act through June 30, 2013, and had not engaged in substantial gainful activity after his alleged disability onset date of December 17, 2010. (Id. at 18.) She next determined that Plaintiff had severe impairments of bipolar I disorder, personality disorder, and history of cannabinoids

---

[10]Dr. DeVore mistakenly refers to this evaluation as being performed by Dr. Moses-Nunley. She performed an evaluation in 2009; the one at issue was performed by Dr. Moore. The underlying criticism – that the evaluation does not consider the lack of a history reporting psychotic systems, the lack of evidence of such symptoms, and the lack of treatment – is relevant regardless of who was the author of the report.

use/abuse.  (Id.)  After reviewing Plaintiff's limited medical records, the ALJ addressed the findings of Dr. Moore.  (Id. at 18-19.)  She declined to give those findings any weight given (a) the absence of any records reflecting Plaintiff was then under treatment; (b) other observations, e.g., Plaintiff's normal speech and fair insight and judgment, in the same examination which are inconsistent with those findings; and (c) the lack of any observations suggesting that Plaintiff was responding during the examination to unheard or unseen stimuli.  (Id. at 19-20.)

The ALJ next determined that Plaintiff did not have an impairment or combination thereof that met or medically equaled an impairment of listing-level severity.  (Id. at 20.)  Specifically, he had no restrictions in his activities of daily living as evidenced by his work on obtaining a GED and working on computers with friends.  (Id.)  He had no difficulties in social functioning.  (Id.)  He did have moderate difficulties in concentration, persistence, or pace.  (Id. at 21.)

The ALJ concluded that Plaintiff has the residual functional capacity (RFC) to perform a full range of work at all exertional levels with nonexertional limitations of (a) being able to understand, remember, and carry out at least simple instructions and non-detailed tasks; (b) not working in a setting which includes constant/ regular contact with the general public; and (c) not performing work which includes more than infrequent handling of customer complaints.  (Id.)  In reaching this conclusion, the ALJ considered Plaintiff's lack of any current counseling, therapy, or medication.  (Id. at 22.)  She found it significant that Plaintiff denied to the consulting examiner any drug use but had had positive findings one month

earlier for cannabinoids. (Id.) She also found it significant that Plaintiff continues to receive unemployment compensation and to look for jobs as a warehouse worker or housekeeper/cleaner. (Id. at 22-23.) Moreover, his ability to attend GED classes and work on computers suggested a mental capacity inconsistent with disability. (Id. at 23.) And, his nominal earnings during the majority of the past fifteen years detracted from a finding that a disability is the cause of his inability to work. (Id.) She gave significant weight to Plaintiff's GAF of 55, finding such to be consistent with his difficulties on admission to DePaul and with his unremarkable discharge findings, and minimal weight to his GAF of 50, finding such to be inconsistent with such examination findings as calm motor activity, orientation to all spheres, and fair insight and judgment. (Id.) The ALJ stated she had "considered the administrative findings of fact made by the State agency medical physicians and other consultants" and had weighed those as non-examining expert sources.[11] (Id.)

With his RFC, Plaintiff could return to his past relevant work as a warehouse worker and, with his RFC, age, education, and work experience, could also perform the work outlined by the vocational expert. (Id. at 23-24.)

Plaintiff was not, therefore, disabled within the meaning of the Act. (Id. at 25.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be

---

[11]The Court notes there was only one non-examining expert source.

expected to result in death.  42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A).  Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months.  **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002).  Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'"  **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting <u>Cuthrell v. Astrue</u>, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1520(a) and 416.920(a)).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  <u>See</u> 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738.  Second, the claimant must have a severe impairment.  <u>See</u> 20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  <u>Id.</u>

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement.

See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009).  "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007)).  Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)).  This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  "The credibility of a claimant's subjective testimony is primarily for the ALJ to

decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). The burden at step four remains with the claimant to prove his RFC and establish he cannot return to his past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005). If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner may meet her burden by eliciting testimony by a VE based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments.'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. "'If after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'" **Partee**, 638 F.3d at 863 (quoting Goff, 421 F.3d at 789).

## Discussion

Plaintiff argues that the ALJ erred in assessing his residual functional capacity (RFC).

As noted above, "[t]he RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities,' despite his or her physical or mental limitations." **Roberson v. Astrue**, 481 F.3d 1020, 1023 (8th Cir. 2007) (quoting Social Security Ruling 96-8p, 1996 WL 374184, at *3 (S.S.A. July 2, 1996)); <u>accord</u> **Masterson v. Barnhart**, 363 F.3d 731, 737 (8th Cir. 2004); **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003). "When determining a claimant's RFC, the ALJ must consider all relevant evidence, including the claimant's own description of her or his limitations, as well as medical records, and observations of treating physicians and others." **Roberson**, 481 F.3d at 1023. <u>See</u> <u>also</u> Social Security Ruling 96-8p, 1996 WL 374184 at *5 (listing factors to be considered when assessing a claimant's RFC, including, among other things, medical history, medical signs and laboratory findings, effects of treatment, medical source statements, recorded observations, and "effects of symptoms . . . that are reasonably attributed to a medically determinable impairment").

Plaintiff argues that the ALJ improperly discounted his description of the limitations caused by his mental illness. Because that description, regardless of whether it was made in the form of testimony or of statements to either consulting examiner, is the only evidence supporting Plaintiff's claim of a disabling mental impairment, the ALJ's credibility determination is pivotal to the question whether her adverse decision is supported by substantial evidence on the record as a whole.

One consideration in that determination was Plaintiff's lack of any mental health treatment. This is a proper consideration. <u>See</u> **Partee**, 638 F.3d at 864 (concluding that, when

assessing a claimant's mental impairments, an ALJ may consider, inter alia, the claimant's failure to seek mental treatment). Plaintiff correctly notes that a mentally ill person's noncompliance with treatment or medication may be the result of the illness. See **Pate-Fires**, 564 F.3d at 945. Moreover, there is a difference between being aware of a need to take medication and "the question whether [a claimant's] noncompliance with [his] medication was a medically-determinable symptom of [his] mental illness." **Id.** On the other hand, the Eighth Circuit has also recognized that "[i]mpairments that are controllable or amenable to treatment do not support a finding of disability." **Davidson v. Astrue**, 578 F.3d 838, 846 (8th Cir. 2009); accord **Johnson v. Apfel**, 240 F.3d 1145, 1148 (8th Cir. 2001). See e.g. **Pratt v. Astrue**, 372 Fed. App'x 681, 682 (8th Cir. 2010) (per curiam) (holding that ALJ's credibility finding was supported by, inter alia, lack of mental health treatment); **Brown v. Astrue**, 357 Fed. App'x 729, 730 (8th Cir. 2009) (per curiam) (same); **Tellez v. Barnhart**, 403 F.3d 953, 957 (8th Cir. 2005) (same).

In the one medical record of Plaintiff's treatment for a mental illness, he reported that medication he had taken in the past had helped. After two days of hospitalization, which included therapy and medication, Plaintiff's insight and judgment were fair; his mood was good; his thought process was linear and goal-oriented; and his thought content lacked delusions. The attending physician, Dr. Baram, recommended at Plaintiff's discharge he take two medications. Plaintiff took neither. Nor is there any other record of him again being hospitalized or treated for any mental impairment. In **Pate-Fires**, 564 F.3d at 946, cited by Plaintiff, the claimant had a lengthy history of mental health treatment, including four

involuntary hospitalizations, and of noncompliance with treatment. The only record of Plaintiff's noncompliance is his failure to follow up on Dr. Baram's recommendation of two medications.

Plaintiff argues that this failure cannot reflect badly on his credibility because he could not afford treatment after his release from the hospital. This argument is unavailing for two reasons. First, there is no evidence he sought any treatment after his release from the hospital. Rather, his testimony was that Christian Hospital "gave" him a doctor, he went to the doctor, but could not afford to pay him. (R. at 37.) The doctor was from DePaul. (Id.) This doctor gave him medication, but he had not taken it in the past sixty days. (R. at 38.) Plaintiff was treated at Christian Hospital only for physical ailments. His treatment at DePaul was for a brief, involuntary hospitalization. The records from DePaul indicate that two medications were recommended five months before the hearing; the recommendation was not pursued. Second, there is no evidence Plaintiff "was ever denied medical treatment due to financial reasons. Without such evidence, [his] failure to [seek such treatment] is relevant to the credibility determination." **Goff**, 421 F.3d at 793.

It is also relevant to the credibility determination that Plaintiff continued to receive unemployment benefits after his alleged disability onset date. "[T]he acceptance of unemployment benefits, which entails an assertion of the ability to work, is facially inconsistent with a claim of disability." **Cox v. Apfel**, 160 F.3d 1203, 1208 (8th Cir. 1998). "However, the negative impact cannot be uniformly or automatically applied in every case." **Id.** Plaintiff correctly argues that his receipt of unemployment benefits alone is not a sufficient

consideration when weighing his credibility. See **Id.** ("Where . . . there is no evidence to detract from the claimant's credibility, the negative inference is not sufficient, of itself, to negate the claimant's credibility."). His argument is misplaced, however, because his receipt of benefits was not one consideration detracting from his credibility. See **Barrett v. Shalala**, 38 F.3d 1019, 1024 (8th Cir. 1994) (noting that claimant's mandatory statement when applying for unemployment that he was capable of working and was seeking work was "clearly inconsistent" with claim of disability during same period and was properly considered by the ALJ as detracting from his credibility).

Another negative consideration was Plaintiff's continuing search for warehouse work – the same job the ALJ found he could perform with his RFC. See **Lansford v. Barnhart**, 76 Fed. App'x 109, 110 (8th Cir. 2003) (per curiam) (holding ALJ properly discredited claimant's subjective complaints based on, inter alia, his search for other work); **Melton v. Apfel**, 181 F.3d 939, 942 (8th Cir. 1999) (same). See also **Bentley v. Shalala**, 52 F.3d 784, 786 (8th Cir. 1995) (finding ALJ properly discredited claimant's description of his limitations when, inter alia, he continued to apply for jobs that were similar to his previous work).

The ALJ considered Plaintiff's nominal earnings as another factor detracting from his credibility. A sporadic work history is a proper consideration when evaluating a claimant's credibility. See **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011); **Wildman v. Astrue**, 596 F.3d 959, 968-69 (8th Cir. 2010). Citing **Priest v. Apfel**, 12 Fed. App'x 445, 446 (8th Cir. 2001) (per curiam), Plaintiff counters that his work history is indicative of his psychiatric impairments. In that case, the claimant's low earnings was the *only* reason given by the ALJ

in support of his decision to discredit the claimant's subjective complaints. **Id.** In the instant case, the ALJ cited Plaintiff's low earnings over a period of fifteen years as an indication his claimed disability as of the past two years was not the cause of his inability to work. This was not, as in **Priest**, the only factor detracting from his claim. Moreover, as noted by the Eighth Circuit in **Phillips**, 721 F.3d at 625, if it is possible to draw two inconsistent positions, the Court must affirm if the Commissioner has adopted one of those two. At best, Plaintiff has framed another explanation for his low earnings that is inconsistent with the ALJ's explanation.

Further challenging the ALJ's credibility determination, Plaintiff argues that too much emphasis was placed on Plaintiff attending GED classes and working on computers. He notes that he testified the classes were to begin after the hearing and that his mother reported she went with him to work on computers once a month. He also testified, however, that, on an average day, he goes to the career center to work on the computer with a friend. This either conflicts with his report seven months earlier that he had no friends and never went outside, or it evidences significant improvement during those months. He testified during the same hearing that he tries to read and do class work for his GED during the day.

"'If an ALJ expressly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination.'" **Boettcher v. Astrue**, 652 F.3d 860, 865 (8th Cir. 2011) (quoting <u>Juszczyk v. Astrue</u>, 542 F.3d 626, 632 (8th Cir. 2008)); <u>accord</u> **Buckner**, 646 F.3d at 558. In the instant case, the ALJ gave good reasons, supported by the record, for her credibility determination. Regardless whether each of those reasons alone would support that determination, as Plaintiff urges, in combination, they do.

Plaintiff also contends the ALJ erred by not discussing Dr. Moses-Nunley's opinion. The Commissioner counters that the ALJ was not required to because it was issued pursuant to prior applications. "Evidence from outside the insured period can be used in 'helping to elucidate a medical condition during the time for which benefits might be awarded.'" **Cox v. Barnhart**, 471 F.3d 902, 907 (8th Cir. 2006) (quoting Pyland v. Apfel, 149 F.3d 873, 877 (8th Cir. 1998)). Regardless of whether the ALJ erred in her omission, it was harmless because there is no indication she "would have decided differently if the error had not occurred." **Byes v. Astrue**, 687 F.3d 913, 917 (8th Cir. 2012).

Plaintiff alleged a disability onset date that was sixteen months after Dr. Moses-Nunley performed her examination. He told her his primary problem was hearing voices beginning in 1992. He reported taking medication did not help. He told the only source who treated him for a mental impairment – a treatment that occurred after his onset date – that medication helped. He reported the voices told him to hurt himself and others and to commit antisocial acts. He did not offer this explanation the only time, i.e., November 2011, when he received psychiatric treatment for an antisocial act. He could not name any of the four past presidents, although he was later able to name the current and past presidents when examined by Dr. Moore. And, as noted by the Commissioner, Plaintiff's two highest years of reportable income were the year of and the year after the examination. Although, as noted by Plaintiff, "[a]ny medical diagnosis must necessarily rely upon the patient's history and subjective complaints," **Brand v. Sec'y of Dept. of Health, Educ. and Welfare**, 623 F.2d 523, 526 (8th Cir. 1980),

an assessment based only on a claimant's subjective complaints may be discounted when those complaints are properly found not to be credible.

Plaintiff further argues that Dr. Moses-Nunley's opinion is significant because it is consistent with that of Dr. Moore. For instance, both found that Plaintiff had poor impulse control and both assessed similar marked limitations in his functioning. Both based their findings on Plaintiff's subjective complaints. The opinion of either consulting examiner may be given little weight if it is based largely on the subjective complaints of a claimant found not to be credible, see **Kirby v. Astrue**, 500 F.3d 705, 709 (8th Cir. 2007), or may be rejected if inconsistent with the record as a whole, **Pearsall**, 274 F.3d at 1219. See also **McCoy**, 648 F.3d at 617 (holding ALJ did not err in discrediting mental RFC assessment of neurologist that was based, "at least in part, on [claimant's] self-reported symptoms" which had been "found to be less than credible").

Plaintiff takes issue with the ALJ's decision to give minimal weight to Dr. Moore's GAF score of 50 and significant weight to the GAF score of 55 assessed when Plaintiff left the hospital, arguing that the latter is not truly reflective of his functioning abilities because it was assessed after two days of therapy and medication. Although a GAF of 50 "reflects serious limitations in a patient's general ability to perform basic tasks of daily life," **Brueggemann v. Barnhart**, 348 F.3d 689, 695 (8th Cir. 2003), a low GAF score may be disregarded if it is linked to a claimant's noncompliance with treatment, see **Earnhart v. Astrue**, 484 Fed. App'x 73, 75 (8th Cir. 2012) (per curiam). A GAF of 55 reflects "moderate symptoms or moderate

difficulty in social or occupational functioning." **Halverson v. Astrue**, 600 F.3d 922, 931 (8th Cir. 2010). Plaintiff's GAF of 55 followed his brief hospital stay.

"[A]n ALJ may afford greater weight to medical evidence and testimony than to GAF scores when the evidence requires it." **Jones**, 619 F.3d at 974 (internal quotations omitted). Clearly, the ALJ may also afford greater weight to one GAF score than to another when the evidence supports such a decision. Also, the Commissioner "has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings." **Id.** at 973-74 (internal quotations omitted).

In his final challenge to the ALJ's decision, Plaintiff argues it was error not to discuss the weight she gave Dr. DeVore's assessments. The ALJ stated that she weighed those assessments as being from non-examining expert sources. Any error in not further explaining the weight given is harmless.

"[T]he burden of persuasion to prove disability and demonstrate RFC [is] on the claimant." **Vossen v. Astrue**, 612 F.3d 1011, 1016 (8th Cir. 2010). See also **Kamann v. Colvin**, 721 F.3d 945, 950 (8th Cir. 2013) ("Ultimately, the claimant bears the burden of proving disability and providing medical evidence as to the existence and severity of an impairment."); **Perkins v. Astrue**, 648 F.3d 892, 902 (8th Cir. 2011) ("[T]he ALJ [is] not required to adopt [the claimant's] unsupported subjective complaints and self-imposed limitations."). For the reasons set forth above, Plaintiff has failed to carry his burdens.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "If substantial evidence supports the ALJ's decision, [the Court] [should] not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because [the Court] would have decided differently." **Wildman**, 596 F.3d at 964. Accord **Pearsall**, 274 F.3d at 1219 ("An administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

The parties are advised that they have **fourteen days** in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  29th  day of January, 2014.